## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | § | **Chapter 11** |
| | § | |
| **VALERITAS HOLDINGS, INC., et al.,**[1] | § | **Case No. 20-10290 (JKS)** |
| | § | |
| | § | **(Jointly Administered)** |
| | | |
| **EMERALD CAPITAL ADVISORS CORP. as Liquidating Trustee of Valeritas Holdings, Inc.,** | § § § | |
| | § | |
| *Plaintiff,* | § | **Adversary No. _____** |
| | § | |
| v. | § | |
| | § | |
| | § | |
| **JOHN TIMBERLAKE, RODNEY ALTMAN, PETER DEVLIN, JOE MANDATO, BRIAN ROBERTS, KATHERINE CROTHALL, GEOFFREY JENKINS, ERICK LUCERA, MATT NGUYEN, JOSEPH SALDANHA, SCOTT HUIE, LEISA SWANSON, MIKE REED, CHRIS GREGORY, MARK CONLEY AND JEFFREY ZAJAC, JOHN DOES 1-10,** | § § § § § § § § § § § § § § | |
| | § | |
| *Defendants.* | § | |

---

## TRUSTEE'S ORIGINAL COMPLAINT

---

Emerald Capital Advisors Corp., the Liquidating Trustee (the "Trustee") for the creditors of the estate of Valeritas Holdings, Inc. (the "Debtor"), by and through its undersigned counsel, brings this action against former officers and directors of the Debtor and alleges as follows:

---

[1] The debtors in these chapter 11 cases are: Valeritas Holdings, Inc.; Valeritas, Inc.; Valeritas Security Corporation; and Valeritas US, LLC.

## NATURE OF THE ACTION

1.      This case arises out of the Board's abject failure to provide rigorous oversight of mission critical risks regarding the Debtor's flagship product, the V-Go® Wearable Insulin Delivery device (the "V-Go®").[2] The Board failed to ensure it was informed of management's July 2018 unauthorized change to the V-Go®'s testing release criteria that violated FDA premarket approval (the July 2018 unauthorized change referred to herein as "URC"). The Board's lack of oversight was so egregious that it took a prospective purchaser of the Debtor to discover the URC in its December 2019 due diligence—causing it and another prospective purchaser to withdraw their purchase offers that, if closed, would have paid creditors in full and provided a return to shareholders.

2.      Defendants Jenkins, Huie, Zajac and Gregory were responsible for the URC, and, on information and belief, made or approved such change without obtaining FDA clearance or scientific data supporting the safety or efficacy of the URC. On information and belief, Reed, Conley, Timberlake, Saldhana, Lucera and Nguyen knew or should have known of the URC prior to the prospective purchaser discovering it December 5, 2019. Further, the Officers failed to inform the Board of the URC and of the associated compliance and safety risks.[3]

3.      In violation of its fiduciary duties, the Board failed to implement any reporting or information system controls, ignored red flags from the FDA in September 2018 regarding the V-Go®'s non-compliance, failed to inform themselves of the URC and  failed to regularly exercise meaningful examination of the V-Go®'s compliance and quality. To add insult to injury, the Defendants recklessly hid this malfeasance from the public after a prospective purchaser of the

---

[2] The director Defendants John Timberlake, Joe Mandato, Katherine Crothall, Rodney Altman, Peter Devlin, and Brian Roberts are referred to herein as "the Board".

[3] Defendants John Timberlake, Geoffrey Jenkins, Mike Reed, Erick Lucera, Matt Nguyen, Joseph Saldanha, Scott Huie, Jeffrey Zajac, Mark Conley and Chris Gregory are referred to herein as "the Officers".

Debtor discovered the URC on December 5, 2019.[4] Predictably, this callous conduct resulted in a substantial loss of value that ultimately plunged the Debtor into bankruptcy.

4.     The Debtor manufactured a wearable, disposable insulin pump called the "V-Go®", "a once-daily insulin wearable, patch-like, device that helps provide blood sugar control for everyday lifestyles."[5] Sales of the V-Go® were the Debtor's sole means of generating revenue.

5.     The FDA approved the Debtor's 510(k) submission for the V-Go® in 2010, which required the device to be tested to meet certain specifications before sale and delivery to patients. Because the V-Go® is a highly regulated medical device, the Board was obligated to ensure that mission-critical matters were monitored effectively and that, when significant issues arose, they would be escalated in a timely manner to the Board's attention, especially those related to the V-Go®'s compliance with the Debtor's 510(k) approval. But the Board failed to implement an enterprise risk management and compliance program to regularly identify and prioritize regulatory and safety risks related to the V-Go®.

6.     Rather, the Debtor's compliance culture was the "Wild West."  On information and belief, mounting financial pressure caused Defendants Jenkins and Zajac to change the V-Go®'s 510(k) production lot release testing specifications without FDA approval from +/- 4% to +/- 9% in July 2018. On information and belief, the change was made to release more V-Go® units into the market to drive sales given the Debtor's dire financial straits. Defendant Jenkins, the Executive Vice President, Manufacturing, Operations and Research & Development and Defendant Zajac, Vice President of Operations, ultimately were responsible for such change. Under Jenkins and Zajac's watch, such change was made without supporting data to ensure the V-Go®'s safety, compliance and efficacy.  Defendants Gregory, Reed, Huie, Zajac and Jenkins were officers on

---

[4] The Board and the Officers are collectively referred to herein as "the Defendants".
[5] https://www.go-vgo.com/

the Debtor's manufacturing, operations, and research and development team and ostensibly were aware of the URC prior to the prospective purchaser's discovery of the URC on December 5, 2019.

7.      Astoundingly, in breach of its duties of loyalty and good faith, the Board failed to learn of the URC. Moreover, the Board failed to make any effort, much less a good faith effort, to periodically inquire of management as to the V-Go®'s compliance with the 510(k). The Board's ignorance of the URC is attributable to its failure to implement necessary enterprise risk management and compliance programs that would identify and prioritize the V-Go®'s legal and regulatory risk.

8.      As a result of the Board's failure to have an oversight system, the FDA, after a September 2018 site audit, warned Defendants Huie and Jenkins of numerous compliance issues regarding the V-Go® shortly after Jenkins and Zajac implemented the URC. Nonetheless, the Board failed to conduct periodic enterprise risk assessments thereafter at reasonable intervals to identify and prioritize the V-Go®'s legal and regulatory risks.  In blatant violation of its fiduciary duties of loyalty and good faith, the Board failed to create a committee to monitor the V-Go®'s labeling and compliance risks and tailor the level of oversight accordingly. Without any oversight system in place, the Board was also entirely unaware of a subsequent change to a spring in the V-Go®, which occurred on or about May 2019 (the "Spring Issue"), that ostensibly may have also impacted the V-Go®'s performance.

9.      As detailed in the Debtor's Form 10-K for 2018, the Debtor had never made money, its losses were mounting, and its accountants issued a going concern qualification. Accordingly, the Board authorized the hiring of an investment bank in February 2019 to pursue restructuring options, including a sale. Thereafter, two suitors submitted substantial purchase bids large enough to pay creditors in full and provide a return to shareholders.

10.     But during its due diligence at the Debtor's manufacturing facility in China on December 5, 2019, one of the prospective purchasers discovered the URC, and notified at least Defendants Jenkins and Zajac the next day. Jenkins and Zajac, however, failed to immediately notify the Board of this critical violation. When the Board finally became aware of and discussed "the product issue" over a week later on December 14, 2019, the Board minutes reflect no discussion of the URC.

11.     Naturally, the prospective purchaser who discovered the URC withdrew its purchase offer on December 9, 2019. Thereafter, the other prospective purchaser withdrew its offer because of the URC and its significant likely adverse consequences to the Debtor and to any buyer of its assets. The discovery of the URC by one of the prospective purchasers caused a precipitous decline in the Debtor's value, with the Debtor's share price falling more than fifty percent as a result.

12.     On information and belief, before the prospective purchaser's discovery of the URC, Defendants Jenkins, Reed, Huie, Zajac, Gregory, Nguyen and Saldhana (as officers entrusted with manufacturing, research and sales of the V-Go®) knew about the URC but did not tell the Board about it. Indeed, less than one week after the prospective purchaser's discovery of the URC, Reed and Zajac described the root cause of the product issue in internal corrective action documents, stating: "Releasing product outside the agreed upon production release criteria *does not comply with established product labeling requirements*."  (emphasis added).

13.     After the prospective purchaser discovered the URC on December 5, 2019, the Defendants misrepresented the cause of the product issue to patients, stakeholders and creditors. The Defendants recklessly failed to disclose to the public that the URC was the true root cause of the product issue.  Instead, the Defendants caused a press release to be issued on December 20,

2019 pinning the blame on a "manufacturing yield" issue and misleading the public by failing to mention the URC as the cause for 1) the delay and disruption in product supply; 2) revised negative gross margin expectation for Q4 2019; and 3) an inventory write off of up to $8 million.

14.     At the same time, Timberlake, Gregory, Jenkins, Reed, Huie and Zajac focused on obtaining incentive payments and post-sale employment with the stalking horse bidder Zealand Pharma by disclosing to Zealand the true root cause of the performance issue as the URC, but stating a different cause publicly. The Defendants' breaches of their fiduciary duties caused the Debtor to file for Chapter 11 protection, leading to a sale of the Debtor's assets to Zealand Pharma in February 2020 for $23,000,000—*substantially less* than the two purchase offers received by the Debtor weeks earlier that would have paid creditors in full and provided a return to shareholders. (emphasis added).

15.     Plaintiff brings the following claims to recover the grievous losses suffered by the bankruptcy estate and its creditors due to Defendants' breaches of their fiduciary duties.

<u>**PARTIES AND RELATED ENTITIES**</u>

16.     Plaintiff Emerald Capital Advisors Corp. is a corporation founded under New York law with its principal place of business in New York and is the Liquidating Trustee of the Creditor's Trust. The Creditor's Trust was formed pursuant to the Debtor's Confirmed Plan of Liquidation (the "Plan"). Pursuant to Section 7.4 (f) of the Plan and 6.2 of the Creditor's Trust Agreement, the Debtor transferred certain causes of action, including those asserted herein, to Plaintiff Trustee.

17.     Defendant John Timberlake ("Timberlake") is an individual who at all relevant times was the President and Chief Executive Officer of Debtor. Timberlake also served as a director of the Debtor at all relevant times. On information and belief, Timberlake is a citizen and

resident of Texas. Timberlake may be served with process at his residence, 345 Lombardia Dr. #18A Austin, Texas 78734.

18.    Defendant Rodney Altman ("Altman") is an individual who at all relevant times served as a director of Debtor. On information and belief, Altman is a citizen and resident of California. Altman may be served with process at his residence, 2584 Greenwich St., San Francisco, California 94123.

19.    Defendant Peter Devlin ("Devlin") is an individual who at all relevant times served as a director of Debtor. On information and belief, Devlin is a citizen and resident of Massachusetts. Devlin may be served with process at his residence, 36 Haverhill Rd. Apt. 1101, Amesbury, Massachusetts 01913.

20.    Defendant Joe Mandato ("Mandato") is an individual who at all relevant times served as a director of Debtor. On information and belief, Mandato is a citizen and resident of California. Mandato may be served with process at his residence, 82 Monte Vista Ave, Atherton, California 94207.

21.    Defendant Brian Roberts ("Roberts") is an individual who at all relevant times served as a director of Debtor. On information and belief, Roberts is a citizen and resident of Massachusetts. Roberts may be served with process at his residence, 10 Governor Doherty Rd., Billerica, Massachusetts 01821.

22.    Defendant Katherine Crothall ("Crothall") is an individual who at all relevant times served as a director of Debtor. On information and belief, Crothall is a citizen and resident of Pennsylvania. Crothall may be served with process at her residence, 1301 Lafayette Rd., Gladwyne, Pennsylvania 19035.

23.     Defendant Geoffrey Jenkins ("Jenkins") is an individual who at all relevant times was the Executive Vice President, Manufacturing Operations and Research and Development of Debtor. Jenkins served as an officer of Debtor. On information and belief, Jenkins is a citizen and resident of Massachusetts. Jenkins may be served with process at his residence, 1 Shawmut St., South Dartmouth, Massachusetts 02748.

24.     Defendant Erick Lucera ("Lucera") is an individual who at all relevant times was the Executive Vice President and Chief Financial Officer of Debtor. Lucera served as an officer of Debtor. On information and belief, Lucera is a citizen and resident of Massachusetts. Lucera may be served with process at his residence, 138 Thistle Rd., North Andover, Massachusetts 01845.

25.     Defendant Matthew Nguyen ("Nguyen") is an individual who at all relevant times was the Chief Operating Officer of Debtor. Nguyen served as an officer of Debtor. On information and belief, Nguyen is a citizen and resident of New Jersey. Nguyen may be served with process at his residence, 27 Higgins Farm Rd., Stockton, New Jersey 08559.

26.     Defendant Joseph Saldanha ("Saldanha") is an individual who at all relevant times was the Chief Business Officer of Debtor. Saldanha served as an officer of Debtor. On information and belief, Saldanha is a citizen and resident of California. Saldanha may be served with process at his residence, 21201 Kittridge St. Apt. 4408, Woodland Hills, California 91303.

27.     Defendant Scott Huie ("Huie") is an individual who at all relevant times was the Vice President, Corporate Compliance and Information Systems, of Debtor. Huie served as an officer of Debtor. On information and belief, Huie is a citizen and resident of Massachusetts. Huie may be served with process at his residence, 16 Park Grove Ln., Shrewsbury, Massachusetts 01545.

28.     Defendant Leisa Swanson ("Swanson") is an individual who at all relevant times was an officer of Debtor. On information and belief, Swanson is a citizen and resident of California. Swanson may be served with process at her residence, 1370 Sawleaf Ct., San Luis Obispo, California 93401.

29.     Defendant Mike Reed ("Reed") is an individual who was the Vice President, Regulatory Affairs and Quality Assurance beginning in July 2019. Reed served as an officer of Debtor. On information and belief, Reed is a citizen and resident of New Hampshire. Reed may be served with process at his residence 151 N. Shore Rd., New Durham, New Hampshire 03855.

30.     Defendant Jeffrey Zajac ("Zajac") is an individual who at all relevant times was the Vice President of Operations. Zajac served as an officer of Debtor. On information and belief, Zajac is a citizen and resident of Massachusetts. Zajac may be served with process at his residence, 8 Maple St., Wareham, Massachusetts 02571.

31.     Defendant Chris Gregory ("Gregory") is an individual who at all relevant times was the Vice President of Research and Development. Gregory served as an officer of Debtor. On information and belief, Gregory is a citizen and resident of Pennsylvania. Gregory may be served with process at his residence, 1321 Wrightstown Rd., Newton, Pennsylvania 18940.

32.     Defendant Mark Conley ("Conley") is an individual who at all relevant times was the Vice President, Corporate Controller, Treasurer. Conley served as an officer of Debtor. On information and belief, Gregory is a citizen and resident of Massachusetts. Conley may be served with process at his residence, 4 Bridie Ln., Norfolk, Massachusetts 02056.

33.     John Does 1-10 are individual officers and directors of Debtors who at all relevant times served Debtor and, on information and belief, may be involved with the allegations discussed herein.

34.     The individuals discussed in paragraphs 17 through 33 will hereafter be referred to collectively as "Defendants."

### JURISDICTION AND VENUE

35.     This Court has subject matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(b). The claims asserted herein relate to the Delaware Bankruptcy Case, a case under Title 11 of the U.S. Code.

36.     Venue lies in this district under 28 U.S.C. § 1409.

37.     This is a non-core proceeding as to Defendants other than Nguyen, and arguably Timberlake, Gregory, Reed, Zajac and Jenkins.

### FACTUAL ALLEGATIONS

**A.     The birth of the V-Go®: a convenient solution for Type 2 diabetes patients.**

38.     Debtor Valeritas Holdings, Inc. is a medical technology company. Debtor's flagship product is the V-Go®.

39.     The V-Go® is an insulin pump that patients wear as a patch to help treat type 2 diabetes. The V-Go® fulfills a unique need for type 2 diabetes patients by releasing a continuous preset basal rate of insulin over a 24-hour period. A basal rate is the background supply of a chemical or process. As it applies to diabetes, the basal rate is the rate at which an insulin pump infuses small, "background" doses of short-acting insulin. Over a 24-hour period, the basal flow of insulin accounts for about 50% of a person's total daily insulin requirement. In essence, the patch-like device enables patients to mimic the body's normal patterns of insulin delivery in a convenient, unobtrusive manner, eliminating the need for multiple daily injections.

40.     The V-Go® is available in three different preset basal rates, reflecting basal delivery of either 20, 30, or 40 units per day, with each version allowing up to 36 additional units

for on-demand bolusing, i.e., up to 18 pushes daily, at which point the device has a "lock-out" feature which signals patients that no more boluses can be given. Effectively, the V-Go® allows for the delivery of up to a total of 56, 66, or 76 units of insulin per day, depending on the basal rate, which covers approximately 70% of people with type 2 diabetes on insulin therapy. The V-Go weighs roughly one ounce when the reservoir is full.

41.     To receive regulatory approval to sell the V-Go®, the Debtor submitted a 510(k) pre-market approval to the FDA to demonstrate that the V-Go® was as safe and effective as, and substantially equivalent, to a legally marketed device.[6] The Debtor received FDA approval to sell the V-Go® in 2010.

42.     The Debtor's 510(k) premarket approval specifications for the V-Go®'s commercial manufacturing release criteria were +/- 4% for the lot mean, and an equal to or less than 4% standard deviation. In other words, the Debtor was required to test each batch of completed V-Go® units against those specifications before the units could be released for sale to the public. Such specifications were to protect patient health by reducing the likelihood of units being sold that could infuse diabetes patients with too much or too little insulin, thereby causing hypoglycemia or hyperglycemia.

43.     When a manufacturer wishes to change or modify a legally marketed device, the FDA provides the following guidance regarding the necessity of a new 510(k) submission:

> [A new 510(k) submission is required when] there is a change or modification to a legally marketed device and that change could significantly affect its safety or effectiveness. The burden is on [Valeritas] to decide whether or not a modification could significantly affect safety or effectiveness of the device. Any modifications must be made in accordance with the Quality System regulation, 21 CFR 820, and recorded in the device master record and change control records. It is recommended

---

[6] A 510(k) is a premarket submission made to FDA to demonstrate that the device to be marketed is as safe and effective, that is, substantially equivalent, to a legally marketed device. https://www.fda.gov/medical-devices/premarket-submissions-selecting-and-preparing-correct-submission/premarket-notification-510k.

that the justification for submitting or not submitting a new 510(k) be recorded in the change control records.[7]

Although Defendants Jenkins and Zajac did not change or modify the V-Go®, they did modify the V-Go®'s specifications on or about July 2018. The URC required a new 510(k) premarket notification, on information and belief, because it changed the V-Go®'s manufacturing process, specifically the testing release criteria.[8] Defendants Reed and Zajac acknowledge as much in an internal corrective action document dated December 11, 2019: "Releasing product outside the agreed upon production release criteria does not comply with established product labeling requirements."

      44.    Furthermore, 21 C.F.R. § 820.80 requires the Debtor to establish and maintain procedures for acceptance activities including tests, or other verification activities.[9] To be sure, 21 C.F.R. § 820.80 (d) provides:

> (d) Final acceptance activities. Each manufacturer shall establish and maintain procedures for finished device acceptance to ensure that each production run, lot, or batch of finished devices meets acceptance criteria.

---

[7] *See id.*

[8] 21 C.F.R. §807.81 (a) (3) provides in relevant part:

> Except as provided in paragraph (b) of this section, each person who is required to register his establishment pursuant to § 807.20 must submit a premarket notification submission to the Food and Drug Administration at least 90 days before he proposes to begin the introduction or delivery for introduction into interstate commerce for commercial distribution of a device intended for human use which meets any of the following criteria:

> (3) The device is one that the person currently has in commercial distribution or is reintroducing into commercial distribution, but that is about to be significantly changed or modified in design, components, method of manufacture, or intended use. The following constitute significant changes or modifications *that require a premarket notification:*

>> (i) A change or modification in the device *that could significantly affect the safety or effectiveness of the device*, e.g., a significant change or modification in design, material, chemical composition, energy source, or *manufacturing process.* (emphasis added).

[9] 21 CFR Part 820 is part of the Current Good Manufacturing Practice regulations. It ensures that all medical devices created and developed within the United States market are safe and follow satisfactory quality processes at all stages of development. This is important for manufacturers to ensure they are producing medical devices which are effective and assure patient safety. https://www.ideagen.com/thought-leadership/blog/guide-to-21-cfr-part-820

45.     The V-Go®'s compliance with the 510(k) release criteria was critical to protecting patients' health and the Debtor's viability as a going concern. A unilateral and unauthorized change to the V-Go®'s release specifications could threaten public health by releasing devices into the market that could potentially cause diabetes patients to suffer hypoglycemia (low blood sugar) or hyperglycemia (high blood sugar). Importantly, V-Go® sales were the Debtor's sole source of income. Given the mission critical of ensuring the V-Go®'s compliance with regulatory requirements, including the 510(k), the Board had fiduciary duties to monitor and stay apprised of risks that jeopardized compliance, patient safety, and sales.

46.     The Board's oversight function had to be rigorously exercised to ensure that the Debtor's sole product—the V-Go®—was safe and effective for patients. The 510(k) approved testing criteria was substantially important in this regard. Prior to releasing batches of finished V-Go® for commercial sale, the Debtor needed to test production lots to ensure a basal rate lot acceptance criteria of +/- 4% for the lot (22,000 devices) mean (i.e. 21,120 units performed to within +/- 10% of the target insulin flow rate) and to ensure a standard deviation equal to or less than 4%, based on a sample size of 20 devices (i.e. at least 19 units would perform to within +/- 10% of the target insulin flow rate).

**B.      The Board failed to implement reasonably designed policies, procedures, and practices to mitigate critical risks regarding the V-Go®.**

47.     Given the critical enterprise risk related to the V-Go®'s 510 (k) compliance, the Board had an obligation to ensure that matters regarding compliance issues (testing, product labeling) were monitored effectively and that, when significant issues arose, they would be escalated in a timely manner to the Board.

48.     At all relevant times, however, the Board failed in numerous respects. *First*, the Board failed to establish a committee overseeing compliance of the V-Go® with regulatory

requirements, including compliance with the 510(k). *Second*, the one committee that was established did not address compliance. Specifically, the Debtor's 2016 Audit Committee charter wholly failed to mention monitoring the V-Go®'s 510(k) compliance and also failed to appoint a subcommittee overseeing the V-Go®'s 510(k) compliance. Rather, the purpose of the Audit Committee was to assist the Board's oversight of the Debtor's accounting and financial reporting processes and the audits of the Debtor's financial statements.[10]

49.     *Third*, the Board failed to implement a reasonable board-level reporting and information system focused on the Debtor's mission critical risk of the V-Go®'s compliance and safety. As several examples, the Board failed to implement: (1) a committee that addressed the V-Go®'s compliance with the 510(k); (2) a process requiring management to keep the Board apprised of the V-Go®'s compliance, risks, or reports; and (3) a schedule for regular Board consideration of any product safety risks. Demonstrating the egregious lack of oversight, the Board minutes from June 19, 2018 through February 8, 2020 contain little to no discussion of the V-Go®'s compliance or safety. Again, the Board was *required* to have systems in place to receive and assess such information.

50.     Given the exacting regulatory standards as to the Debtor's only product, the Board should have also made periodic inquiries of management as to mission critical risks regarding the

---

[10] While internal documents indicate the existence of a "Compliance Steering Committee" that allegedly met semi-annually and a "Compliance Operating Committee" that allegedly met quarterly, the earliest document discovered is a May 2019 presentation from the Steering Committee, well after the initial implementation of the URC. The committees were disengaged from the Board, with no reporting to the Board, as evidenced by the fact that no Board minutes reflect reports or action items generated by either of these two committees. The board of a Delaware corporation has a fiduciary obligation to adopt internal information and reporting systems that are 'reasonably designed to provide to senior management and to the board itself timely, accurate information sufficient to allow management and the board, each within its scope, to reach informed judgments concerning both the corporation's compliance with law and its business performance.' *Hughes v. Xiaoming Hu*, No. CV 2019-0112-JTL, 2020 WL 1987029, at *14 (Del. Ch. Apr. 27, 2020) (quoting *In re China Agritech, Inc. S'holder Deriv. Litig.*, 2013 WL 2181514, at *18 (Del. Ch. May 21, 2013)). The Compliance Committees are utter failures in this regard.

V-Go®'s compliance. Yet, the Board minutes from June 19, 2018 through December 2019 reflect

that the Board made no inquiries of management as to the V-Go®'s compliance and safety.

51.    *Finally*, the Board failed to implement protocols for management to escalate

mission-critical matters to the Board on a timely basis. Instead, management and the Officers were

left to report critical issues to the Board at their own discretion and on an ad-hoc basis. The Board's

failure to create an information and reporting system to monitor the mission critical risk of the V-

Go®'s 510(k) compliance portended disastrous consequences.

**C.    Defendant Jenkins's team, which included Defendants Zajac, Huie and Gregory, modifies the V-Go®'s testing release criteria in July 2018 without FDA clearance, and without informing the Board.**

*i.    The Debtor was substantially leveraged.*

52.    Since the Debtor's inception, it has primarily funded its operations through equity

and debt transactions. The Debtor's predecessor entered into a loan agreement on May 24, 2013

(amended in August 2014 and restated on May 3, 2016) with Capital Royalty Servicing LLC as

agent for Capital Royalty Partners III L.P. and affiliated lenders (collectively, "CRG"), with a six-

year term secured by substantially all of the Debtor's assets. The loan was amended as of February

9, 2017 and again on September 30, 2019. In connection with that amendment, at the request of

the Debtor and to assist the Debtor's restructuring efforts, CRG exchanged $25 million of the

secured loan for 2.5 million shares of Series A Preferred Stock at a price of $10.00 per share.

53.    The Debtor executed a common stock purchase agreement (the "First Purchase

Agreement") with Aspire Capital Fund LLC in January 2018. Under the First Purchase Agreement,

at the Debtor's discretion, Aspire committed to purchase up to $20 million dollars of the Debtor's

common stock over a 30-month period. The Debtor eventually sold 1,250,868 shares of common

stock to Aspire for about $1.8 million in net proceeds under the First Purchase Agreement. In June

2018, the Debtor terminated the First Purchase Agreement and executed a second common stock purchase agreement (the "Second Purchase Agreement") with Aspire. Under the Second Purchase Agreement, at the Debtor's discretion, Aspire committed to purchase up to $20 million dollars of the Debtor's common stock over a 30-month period.

54.     Beginning in at least 2012, the Debtor incurred significant net losses. The Debtor indicated in its 2018 10-K report that its accountant raised substantial doubt about its ability to continue as a going concern. The Debtor also indicated in its 2018 10-K report that it needed to increase sales of the V-Go®. Thus, mounting financial pressure that was particularly acute in 2018 caused the Debtor to cut corners to try to improve sales of the V-Go®.

     *ii.*      *Defendants Jenkins, Zajac, Gregory and Huie are responsible for the changes to the V-Go®'s manufacturing release criteria that was non-compliant with the 510(k).*

55.     Facing mounting debt and pressure to increase sales, the Debtor unilaterally changed the product testing specification to +/- 4% to +/-9% in July 2018. Bill Oakland, an engineering manager with Valeritas who, on information and belief, reported to Defendant Zajac, who reported to Jenkins, is identified in the document recording such change as the individual responsible. This material change to the testing release criteria substantially loosened the manufacturing testing standards of the V-Go®, thereby causing more V-Go® units to be released into the market, including units that would fail to comply with the V-Go®'s delivery accuracy labeling specifications of +/- 10%.[11] For their part, Gregory and Huie also reported to Jenkins. Jenkins, Gregory, Zajac, Huie and Reed (Reed joined the Debtor in July 2019) constituted the leadership team of the Debtor's manufacturing, operations, research and development department.

---

[11] A +/- 10% delivery rate means that the V-Go®'s insulin delivery to the patient is accurate within +/- 10% of the preset insulin output.

Such team, on information and belief, knew of the URC prior to the prospective purchaser discovering it December 5, 2019.

56.     Jenkins's team made this change without submitting a new 510(k), without receiving FDA approval, and without any clinical data supporting the safety or efficacy of the URC. Thus, beginning in July 2018, the Debtor began selling the V-Go® in deviation of its 510(k) approval. The Board (excluding Timberlake who on information and belief had knowledge as an officer), without any oversight mechanism in place, was unaware that the V-Go®'s testing release criteria had radically changed and that noncompliant and potentially unsafe V-Go® devices were being sold to the public.

**D.      The Board's lack of oversight results in the FDA issuing red flags in 2018.**

57.     Not surprisingly, the Board's continuous and systematic lack of oversight resulted in the emergence of red flags just two months after the URC. A September 2018 FDA site inspection discovered numerous compliance issues regarding the V-Go®. The FDA informed Defendant Huie, Debtor's Vice President of Regulatory Affairs / Quality Assurance & Compliance, through an FDA Form 483 of several significant red flags discovered in its site audit:[12]

> a.      The Debtor failed to have Medical Device Reporting ("MDR") procedures. In seven of twenty entries, the Debtor provided inaccurate information to the FDA because the MDR log Defendant Huie provided to the FDA was

---

[12] An FDA Form 483 is issued to management at the conclusion of an inspection when an investigator(s) has observed any conditions that in their judgment may constitute violations of the Food Drug and Cosmetic (FD&C) Act and related Acts. FDA investigators are trained to ensure that each observation noted on the FDA Form 483 is clear, specific and significant. Observations are made when in the investigator's judgment, conditions or practices observed would indicate that any food, drug, device or cosmetic has been adulterated or is being prepared, packed, or held under conditions whereby it may become adulterated or rendered injurious to health. https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/inspection-references/fda-form-483-frequently-asked-questions

inconsistent with the information submitted to the FDA on MEDWATCH FDA Form 3500A;[13]

b.    As to sixty-four (64) adverse events, the Debtor failed to submit an MDR report within 30 days of becoming aware that the V-Go® may have caused or contributed to death or serious injury. As one example, the Debtor became aware of an adverse event on May 12, 2018 but did not submit an MDR report until 50 days thereafter;

c.    The Debtor submitted an FDA Form 3500A that failed to indicate the date the Debtor received information regarding the adverse event. Ten (10) out of twenty (20) MEDWATCH entries reviewed were missing the date the Debtor received information regarding the adverse event;



d.    The Debtor's complaint handling procedure failed to define a timely manner by which customer complaints should be processed. Nine (9) of twenty-two (22) complaint files remained open for periods spanning four (4) to seven (7) months;

e.    The Debtor provided the FDA with two risk analysis documents that had completely opposite assessments for similar failures. For example, the Design Risk Analysis Document stated a failure resulting *in a patient receiving insufficient dose was negligible*. Conversely, the Human Factors Interaction Analysis for Medical Personnel and Patient *stated a failure resulting in a patient receiving insufficient dose is critical*. The Debtor failed to provide an adequate explanation for these opposite conclusions; and

f.    The FDA's review of the Debtor's device history records ("DHR") showed that the DHRs did not contain product labeling or unique device identification information. The FDA mandates that medical device companies produce DHR that contains all documentation related to

---

[13] A Form 3500A is a mechanism to report *mandatory* safety issues with a medical device. *See* "MedWatch Forms for FDA Safety Reporting," https://www.fda.gov/safety/medical-product-safety-information/medwatch-forms-fda-safety-reporting .

> manufacturing and tracking the device, and demonstrates that the device
> was manufactured according to the information in the device master record.
> The DHR is the final proof that the manufacturer has used the 'instruction
> manual' and followed the instructions it contains to manufacture the device.
> The DHR must also include the manufacturer's acceptance records, which
> show that the manufacturer has followed and implemented all the processes
> outlined in the DMR in a compliant way.

58.     In short, the Debtor's product labeling, complaints procedure and device history records raised significant safety and compliance red flags related to the V-Go®.  Defendants Huie, Jenkins, Zajac and Gregory, on information and belief, knew of these compliance issues by October 3, 2018. The FDA also warned the Debtor that it was responsible for conducting internal self-audits thereafter to identify and correct any and all violations of the quality system requirements.

**E.     The Board ignores the red flags.**

59.     Despite the compliance red flags raised by the FDA site audit in September 2018— thirty to sixty days after the URC was first implemented—the Board consciously failed to ensure a reasonable information and reporting system existed thereafter.

60.     Indeed, Board minutes from June 18, 2018 to the date of the Debtor's bankruptcy filing (February 9, 2020) reflect a failure to establish procedures and protocols to ensure that corporate risks and red flags regarding the V-Go®'s compliance were timely escalated to the Board.  For example, the Board failed to amend the Audit Committee charter to appoint a committee charged with compliance related to the V-Go® in light of the FDA's site audit. Moreover, Board minutes from June 18, 2018 to February 9, 2020 fail to mention a compliance committee charged with monitoring the V-Go®'s compliance risk. Instead, the Board's inaction allowed the URC to remain in place, in violation of the 510(k).

61.     No plan of action existed at the Board level, evincing not even a "band-aid" approach to address the serious safety and compliance concerns. In essence, the Board disabled itself from being informed of risks or problems requiring its attention. And, on information and belief, the Board elected to *not* enroll the Debtor in the Medical Device Single Audit Program, or MDSAP. This program, while not mandatory, provides a means for a medical device company to ensure that its devices are compliant with the FDA and other market regulations.

62.     Given the red flags identified by the FDA, enrollment in MDSAP would seem essential. Defendants nonetheless elected to expose the Debtor to significant business risk by not enrolling. The compliance red flags regarding the V-Go®, and the Board's failure to implement an oversight and reporting system thereafter, portended the disaster to follow.

**F.      The Debtor's continued financial woes cause the Debtor to explore a sale beginning in February 2019.**

63.     The Debtor's substantial financial challenges continued through the year 2018.  By December 31, 2018, the Debtor's common stock was trading below $1.00. The Debtor received notice from the Listing Qualifications Department of the Nasdaq Stock Market ("Nasdaq") that the Debtor no longer complied with the minimum bid price requirements set forth in Nasdaq Listing Rule 5550(a)(2) for continued listing on Nasdaq. Accordingly, the Board, on or about late 2018, directed Defendant Timberlake and Defendant Lucera to engage a banker to explore potential strategic alternatives to a future public financing.

64.     The Debtor in February 2019 engaged Aquilo Capital Partners, L.P. to explore restructuring options, including a sale of the Debtor. Shortly thereafter, in 2019, the Debtor requested CRG to convert some of its then secured debt to equity to facilitate a restructuring. On September 30, 2019, CRG converted $25,000,000 of its secured debt to preferred stock.

**G.    The Board's lack of oversight finally catches up to it when two prospective purchasers withdraw their purchase offers due to the discovery of the URC.**

65.    CRG and the Debtor closed a transaction on September 30, 2019, that converted $25 million of CRG's then existing secured debt to Series B Convertible Preferred Stock of the Company. The Debtor solicited the transaction in part to attract additional equity, anticipating that such conversion would cause a material increase in equity price.  Soon after that transaction, the Debtor received significant offers to buy the Company from several buyers. The two offers were structured to pay in full secured creditors and to provide significant returns to the Debtor's shareholders.

66.    The two bidders engaged in final diligence processes with the Debtor. On or about December 5, 2019, one of the bidders discovered the URC during its site visit to the Debtor's manufacturing facility in China.

67.    Thereafter, the bidder informed Jenkins and Zajac about the URC on or about Friday December 6, 2019. As a result of discovering the URC, the bidder withdrew its purchase offer on Monday December 9, 2019. Shortly thereafter, the second bidder followed suit.  In addition to being left without a potential buyer, the Debtor, already cash-strapped, was forced to halt manufacturing of V-Go® devices until it could identify and remedy the issue, causing a write off of up to $8,000,000 in inventory.

68.    The evidence indicates that Defendants Huie, Reed, Zajac, Gregory and Jenkins were aware of the URC prior to the prospective purchaser's discovery of the issue. These Defendants were leaders of the Debtor's manufacturing, operations, research and development team. Moreover, a Corrective and Preventive Action ("CAPA") signed by Defendant Reed on December 11, 2019, a mere five days after the prospective purchaser informed him of the URC, reveals that the implementation of the URC failed to comply with the 510(k):

| Description of Issue/Problem | |
|---|---|
| Valeritas 510(k) K100504 section 18.1 specifies a basal rate lot acceptance criteria of +/- 4% for the lot mean and ≤4% standard deviation based on a sample size of 20 devices. Valeritas implemented production lot release criteria for the mean and CV documented in QA3-824-51 (below) that does not comply with the criteria stated in the cleared 510(k). | |

69.    Ostensibly, no one from the Debtor's manufacturing, operations, research and development team inquired as to whether the Debtor's manufacturer was at fault, thereby raising a strong inference that Reed, Zajac, Huie, Jenkins and Gregory knew about the URC for several months, if not since its initial implementation in July 2018.

70.    Equally troubling, the Board failed to meaningfully address the URC until December 14, 2019, more than one week after the prospective purchaser informed Jenkins and Zajac. Despite the existence of a December 14, 2019 PowerPoint presentation to the Board with generic bullet points under a heading called "Lot Release Issue Update," no Board minutes exist for December 14, 2019.  Moreover, during the December 17, 2019 Board meeting, the minutes reflect disclosure of inventory to be lost, but fail to reference the December 11, 2019 CAPA's conclusion that the root cause of the product issue was the URC. The December 17, 2019 Board minutes also fail to reflect the December 11, 2019 Health Hazard Analysis's admission that "Valeritas implemented production lot release criteria for the mean and CV documented in QA3-824-51 *that does not comply with the criteria stated in the cleared 510(k)*."[14] (emphasis added).

71.    Further evincing the lack of oversight as to the V-Go®'s compliance, Defendant Jenkins issued a document on December 20, 2019 that disturbingly notes the lack documentation underlying the URC:

> *We have not found documentation that explicitly explains the transition to the +
> 9%* although we have signed off documents implementing the release criteria.
> (emphasis added)

---

[14] Health Hazard Evaluations (HHEs) and Health Risk Assessments (HRAs) are the processes that FDA follows to determine the risks of certain device problems and the actions firms should take to resolve them. https://www.fda.gov/about-fda/cdrh-transparency/health-hazard-evaluations-hhes-and-health-risk-assessments-hras#:~:text=HRA%20is%20a%20tool%20for,the%20public%20about%20the%20risk .

72.     In sum, the prospective purchaser's discovery of the V-Go®'s non-compliance with the 510(k) incapacitated the Debtor by:

      a.  causing a substantial disruption in the Debtor's supply of the product;
      b.  delaying available product to be shipped;
      c.  temporarily reducing yields;
      d.  increasing the cost of goods;
      e.  causing a revised, negative gross margin expectation for the fourth quarter of 2019.

73.     Significantly, the Defendants' breaches of fiduciary duties caused a considerable loss of inventory, with an accompanying write-off of up to $8 million. Furthermore, the Debtor's enterprise value declined precipitously after discovery of the URC. Due to the discovery of the URC, both prospective purchasers withdrew their bids, sounding the death knell for the Debtor.

**H.     Defendants negligently misrepresent the cause of the manufacturing issue and the Board continues to be disengaged from the investigation, showing a conscious disregard for mission-critical compliance.**

74.     On information and belief, the URC affected all V-Go® devices manufactured from July 2018 through at least December 5, 2019.  Defendants Timberlake, Jenkins, Huie, Zajac, and Gregory, on information and belief,  knew of this change from its inception sometime in July 2018. Defendant Reed, on information and belief, knew of the URC upon joining the Debtor as its Vice President of Product Compliance in July 2019.

75.     Given that Defendants Jenkins, Huie, Reed, Gregory and Zajac were also aware of their regulatory obligations to the FDA with respect to 510(k) submissions, this significant passage of time evinces a grossly negligent disregard for compliance. Incredibly, at no time prior to the bidder's discovery of the 510(k) issue did Defendants Jenkins, Huie, Gregory, Reed or Zajac direct the Debtor to assess whether or not this change could significantly affect the V-Go®'s safety or effectiveness and thus require a new 510(k) submission.

76.     Instead, after the prospective purchaser's discovery of the URC, Defendants finally

elected to evaluate the potential dangers to the many patients using the V-Go® device. The CAPA

noted that the previously unconsidered risk was high:

| Risk Evaluation: | | | |
|---|---|---|---|
| The risk associated with this CAPA is rated as High. Releasing product outside the agreed upon production release criteria does not comply with established product labeling requirements. CAPA to include a Health Hazard Analysis (HHA) to evaluate potential risk to end users and to develop potential field action plan, if required. | | | |
| Initiated By (Print name): | Mike Reed | Title: | VP, RA & QA |
| Signature: | *[signature]* | Date: | 12/11/2019 |

77.     On December 11, 2019, to determine whether or not V-Go® devices already in the

market and on patients' arms were safe given the 510(k) deviation, the Debtor conducted a HHA.

The HHA also identified one risk of the URC as patients potentially suffering from hypoglycemia

and hyperglycemia:

**Description of the defect, malfunction or user error:**
Valeritas 510(k) K100504 section 18.1 specifies a basal rate lot acceptance criteria of +/- 4% for the lot mean and < 4% standard deviation based on a sample size of 20 devices. Valeritas implemented production lot release criteria for the mean and CV documented in QA3-824-51 (below) that does not comply with the criteria stated in the cleared 510(k).

| If CV % Result is: | Then Basal Mean Tolerance is: |
|---|---|
| 0 to 4.10 | ±9% |
| 4.11 to 4.20 | ±7% |
| 4.21 to 4.30 | ±1% |

Present lot release sample size is n=13 based on typical production lot quantities of approximately 22,000 V-Go devices.
Releasing product outside the agreed upon production release criteria may result in Hypoglycemia or Hyperglycemia events.

While the HHA concluded that such devices were safe, the fact that Defendants' financial bottom

line was the sole motivator for such a study reflects the Defendants' blatant and inexcusable

disregard of their fiduciary duties.

78.     Defendants took actions to cover their tracks after the prospective purchaser

discovered the URC. For instance, Defendants prepared, or had prepared at their direction, a

PowerPoint presentation for a December 14, 2019 Board meeting discussing, in part, a lot release issue update. Tellingly, no Board minutes exist for this meeting. Moreover, the Board minutes after the prospective purchaser discovered the issue make no mention whatsoever of the findings in the CAPA or the HHA. The apparently secretive nature of the Board's discussion on December 14, 2019 raises the specter of bad faith and malfeasance.

79.     This is exemplified by Defendants' egregious carelessness and negligence in failing to disclose the true root cause of the product issue to the public. The Debtor issued a press release on December 20, 2019 that announced revised revenue guidance and preliminary financial results for the fourth quarter and year ended December 31, 2019. The press release inaccurately attributed the revised financials to a "manufacturing yield issue" that had caused a temporary disruption in supply. Yet in the internal CAPA, Defendant Reed admitted the root cause determination was the URC:

| valeritas | Corrective Action Preventive Action Form | CAPA# ☒ SCAR# ☐ | **283** |

| Root Cause Determination – *Describe Root Cause Determination results* |
| The root cause is determined to be incorrect transfer of the agreed upon 510(k) production lot release testing to product lot release test specifications. |

80.     Defendant Timberlake led the drafting and issuance of the press release that inaccurately stated the root cause of the product issue. Thereafter, in preparing the Debtor and its employees to answer questions related to the product issue, Timberlake misdirected employees to

state publicly that the cause of the product issue was a "manufacturing yield issue" rather than the

URC:

**From:** John E Timberlake[jetimberlake@valeritas.com]
**Sent:** Fri 12/20/2019 3:54:43 PM Coordinated Universal Time
**Subject:** manufacturing Yield issue

[EXTERNAL]

We should stay focused on referring this to a manufacturing yield issue

If they as about manufacturing process issue,, redirect to say that was our manufacturing yield issue and Q&A #5 is key

John E Timberlake
President & Chief Executive Officer
Valeritas, Inc.
750 Route 202 South, Suite 600
Bridgewater, NJ  08807
jetimberlake@valeritas.com
(O) 908-927-9920

Moreover, the Defendants prepared a document, with canned and inaccurate answers as to the

cause of the product issue, for the sales team to answer questions regarding the product issue:

**About the Announcement**

1. **What has Valeritas announced?**

   The Company today announced revised revenue guidance and preliminary financial results for the fourth quarter and full year as a result of a manufacturing yield issue that has caused a temporary disruption in supply.

   The issue has caused a delay in available product and the Company will be unable to ship product until the issue is resolved and the supply chain is replenished.

   The Company has also disclosed its ongoing review of strategic alternatives, as it focuses on securing the future of Valeritas and its V-Go Wearable Insulin Delivery device. As part of this review, the Company is exploring strategic alternatives including, but not limited to, a sale, incremental funding by identifying other sources of financing capital, or a sale of the Company's business through a Chapter 11 process.

2. **What is the issue?**

   It is a manufacturing yield issue.

   Importantly, V-Go devices in the field will not be affected. V-Go devices that patients already have in their possession and that are available from retail pharmacies continue to be okay for use.

3. **Are you recalling V-Go from the market?**

   No. V-Go devices in the field will not be affected. V-Go devices that patients already have in their possession and that are available from retail pharmacies continue to be okay for use.

4. **Are V-Go devices already in the market safe / effective?**

   Yes, they are safe and effective.

5. **Will you continue manufacturing V-Go?**

   Yes, we are manufacturing product again. It will take some time to get the product to the U.S.

81.     In short, Defendants egregiously and carelessly failed to disclose the URC as the true cause of the product issue to the general public, instead releasing statements to the public that misleadingly identified the root cause as a manufacturing yield issue.

I.   **Defendants Timberlake, Gregory, Jenkins, Reed, Nguyen, and Zajac breach their duties of loyalty and care by suppressing the true root cause of the V-Go®'s manufacturing compliance violations publicly while seeking incentive payments and employment with Zealand, the stalking horse bidder.**

82.     Having lost two prospective purchase offers due to the Defendants' breaches of fiduciary duties, the Debtor continued to hemorrhage cash and ultimately filed for Chapter 11 bankruptcy on February 9, 2020.  At or around the same time, Zealand Pharma announced a bid to buy substantially all the assets from the Debtor for $23 million in cash in exchange for taking on certain liabilities. This was a stalking horse deal, where Zealand agreed to set a floor price for the assets. The Zealand bid was substantially less than the initial offers made by the two prospective bidders, and far less than the amount needed to pay creditors in full.

83.     The Zealand deal would potentially result in the retention of a significant portion of the Debtor's workforce. Through a Key Employee Incentive Plan ("KEIP"), eleven (11) of the Debtor's senior managers responsible for overseeing the operation of the Debtor's business were incentivized to maximize proceeds realized through a sale transaction in the bankruptcy. Importantly, each KEIP participant waived his/her entitlement to all bonuses and similar payments and also waived all other claims against the Debtor. Each KEIP participant would receive a payment that increased in steps as sales proceeds increase, but no KEIP payment would be earned or payable unless a sale transaction generated gross proceeds of at least $24,000,000.  Timberlake, Gregory, Reed, Zajac, Nguyen and Jenkins participated in the KEIP.

84.     The stalking horse agreement required an assurance that the Debtor did not need more regulatory approval (i.e. an updated 510(k)) to sell the V-Go® and also required an identification of the V-Go® devices that were in the marketplace to ensure that patients would be not be harmed. Zealand made lot testing criteria data and proof that certain lots satisfied

specifications in the applicable 510(k) approved by the FDA conditions precedent to its obligations in the sale agreement.

85.     In breaches of their duties of loyalty and care, Defendants Timberlake, Nguyen, Reed, Zajac, Gregory, and Jenkins, as part of the effort to complete the sale to Zealand, focused on disclosing to Zealand the URC as the true root cause of the product issue. They recommended reverting to the approved 510(k) specifications so as not to require another 510(k). At the same time, however, Timberlake, Nguyen, Reed, Zajac, Huie, and Jenkins participated with the Board to paint the Spring Issue as the culprit to the public. This conflict was based on those Defendants' desire to obtain and secure KEIP payments and post-sale employment by being fully transparent with Zealand regarding the URC, while failing to disclose to the public the URC as the root causes of the production halt and the revised, negative gross margin expectations for Q4 2019.

## CAUSES OF ACTION

### Count One: Breach of Fiduciary Duties as to All Defendants

86.     Trustee fully incorporates and realleges the foregoing allegations as if fully stated herein.

87.     Defendants, as officers and directors of Debtor, owed Debtor and its shareholders a fiduciary duty of due care, loyalty, and good faith.

88.      Defendants breached their fiduciary duties by the actions and inactions alleged herein in connection with the URC discovered by one of the prospective purchasers during its diligence process.

89.     Defendants violated and breached their fiduciary duties of care and loyalty, as well as acted in bad faith.

90.     Defendants had no meaningful monitoring system in place for the V-Go®'s manufacture, quality control and compliance with regulatory requirements, including the 510(k). As Debtor's flagship product and sole source of revenue, such oversight was of the utmost importance. As illustrated in part by the fact that one of the prospective purchasers, not Debtor, discovered the URC, Defendants did not have in place a meaningful system of monitoring the V-Go®'s compliance, acceptance criteria, manufacture, quality control and patient safety. Moreover, Defendants Jenkins, Gregory, Huie, and Zajac implemented the URC without explanation and without the requisite safety testing necessary to make such a change.

91.     Alternatively, Defendants ignored "red flags" as to the V-Go®'s compliance issues. As early as September 2018, FDA inspections revealed systemic compliance issues to Defendants, including product labeling issues.  The URC that was discovered by the prospective purchaser on or about December 5, 2019 was confirmed by the CAPA (just days later) to violate product labeling requirements: "Releasing product outside the agreed upon production release criteria does not comply with established product labeling requirements." Moreover, as previously noted, the URC affected all V-Go® devices manufactured after July 2018 through at least December 5, 2019.

92.      Defendants ignored these issues until December 7, 2019. Defendants' fiduciary duties to the Debtor and its shareholders do not permit Defendants to proverbially "bury their heads in the sand" and ignore such clear issues.

93.     As a direct and proximate result of the Defendants' failure to perform their fiduciary obligations, the Debtor sustained significant damages, including the loss of two purchase offers that would have paid creditors in full and provided a return to shareholders.

### Count Two: Breach of Fiduciary Duties as to Timberlake

94.     Trustee fully incorporates and realleges the foregoing allegations as if fully stated herein.

95.     Timberlake, President and Chief Executive Officer of Debtor, owed Debtor and its shareholders a fiduciary duty of due care, loyalty, and good faith.

96.     In addition to breaching these duties in the manner set forth in Count One, Timberlake breached his specific duties as the Chief Executive Officer specifically charged with Debtor's corporate compliance by failing to adequately bring the described red flags to the Board at regular intervals.

97.     Timberlake made no effort to implement or recommend oversight systems at the Board level. As evidenced by the 2018 FDA audit and the discovery of the URC that led to Debtor's bankruptcy, Timberlake's course of conduct as the Chief Executive Officer was tantamount to blatant disregard of his fiduciary duties.

98.     Moreover, Timberlake, as Chief Executive Officer, on information and belief, knew of the URC prior to it being discovered by the prospective purchaser. Despite this knowledge, Timberlake failed to undertake any course of action to correct this deviation, prior to the prospective purchaser discovering the URC on or about December 5, 2019.

99.     In addition to breaching these duties in the manner set forth in Count One, Timberlake engaged in egregiously careless and negligent tactics to hide the critical issues from the public at large once the URC was discovered by the prospective purchaser, and admitted by Reed in the CAPA.

100.    Instead of being forthright, Timberlake engaged in a self-serving campaign to falsely minimize the URC to the public, to the detriment of the Debtor and its shareholders.

101.    Timberlake focused on satisfying Zealand's purchase conditions that would increase his chance of receiving KEIP payments and ensure his post-sale employment with Zealand, rather than ensuring that the true root cause of the V-Go®'s performance deviations was disclosed to the public.

102.    As a direct and proximate result of Timberlake's failure to perform their fiduciary obligations, the Debtor has sustained significant damages, including the loss of two purchase offers that would have paid creditors in full and provided a return to shareholders.

**Count Three: Breach of Fiduciary Duties as to Huie**

103.    Trustee fully incorporates and realleges the foregoing allegations as if fully stated herein.

104.    Huie, as Vice President Corporate Compliance and Information Systems of Debtor, owed Debtor and its shareholders a fiduciary duty of due care, loyalty, and good faith.

105.    In addition to breaching these duties in the manner set forth in Count One, Huie breached his specific duties as an officer specifically charged with Debtor's corporate compliance by failing to adequately bring the described red flags to the Board at regular intervals.

106.    Huie made no effort to implement or recommend oversight systems at the Board level. As evidenced by the 2018 FDA audit and the URC that led to Debtor's bankruptcy, Huie's course of conduct as the head of compliance was tantamount to blatant disregard of his fiduciary duties.

107.    Moreover, Huie, as an officer on the manufacturing, operations and research and development team, on information and belief, knew of the URC prior to it being discovered by the prospective purchaser. Despite this knowledge, Huie failed to undertake any course of action to

correct this deviation, prior to the prospective purchaser discovering the URC on or about December 5, 2019.

108.    As a direct and proximate result of Huie's failure to perform his fiduciary obligations, the Debtor has sustained significant damages, including the loss of two purchase offers that would have paid creditors in full and provided a return to shareholders.

### Count Four: Breach of Fiduciary Duties as to Jenkins

109.    Trustee fully incorporates and realleges the foregoing allegations as if fully stated herein.

110.    Jenkins, as Executive Vice President, Manufacturing Operations and Research and Development of Debtor owed Debtor and its shareholders a fiduciary duty of due care, loyalty, and good faith.

111.    In addition to breaching these duties in the manner set forth in Count One, Jenkins breached his specific duties as the de facto head of Debtor's corporate compliance by failing to adequately bring the described red flags to the Board at regular intervals.

112.    Jenkins also failed to adequately fulfill his role as an officer in charge of compliance. As evidenced by the 2018 FDA audit and the discovery of the URC that led to Debtor's bankruptcy, Jenkins's course of conduct as the head of compliance was tantamount to blatant disregard of his fiduciary duties.

113.    Moreover, Jenkins, as the officer in charge of the manufacturing, operations and research and development team, on information and belief, knew of the URC prior to it being discovered by the prospective purchaser, as evidenced by the December 11, 2019 CAPA and HHA. Despite this knowledge, Jenkins failed to undertake any course of action to correct this deviation, prior to the prospective purchaser discovering the URC on or about December 5, 2019.

114.    Additionally, Jenkins focused on satisfying Zealand's purchase conditions that would increase his chance of receiving KEIP payments and ensure his post-sale employment with Zealand, rather than ensuring that the true root cause of the V-Go®'s performance deviations was disclosed to the public.

115.    As a direct and proximate result of Jenkins's failure to perform his fiduciary obligations, the Debtor has sustained significant damages, including the loss of two purchase offers that would have paid creditors in full and provided a return to shareholders.

**Count Five: Breach of Fiduciary Duties as to Reed**

116.    Trustee fully incorporates and realleges the foregoing allegations as if fully stated herein.

117.    Reed, Vice President, Regulatory Affairs and Quality Assurance, owed Debtor and its shareholders a fiduciary duty of due care, loyalty, and good faith.

118.    In addition to breaching these duties in the manner set forth in Count One, as evidenced by the CAPA, Reed breached his specific duties in his role as the Vice President, Regulatory Affairs and Quality Assurance by failing to alert the Board about the URC prior to the prospective purchaser's discovery of the issue.

119.    Reed, as an officer on the manufacturing, operations, and research and development team, on information and belief, knew of the URC prior to it being discovered by the prospective purchaser, as evidenced by the December 11, 2019 CAPA and HHA. Despite this knowledge, Reed failed to undertake any course of action to correct this deviation, prior to the prospective purchaser discovering the URC on or about December 5, 2019.

120.    Additionally, Reed focused on satisfying Zealand's purchase conditions that would increase his chance of receiving KEIP payments and ensure his post-sale employment with

Zealand rather than ensuring that the true root cause of the V-Go®'s performance deviations was disclosed to the public.

121.   As a direct and proximate result of Reed's failure to perform his fiduciary obligations, the Debtor has sustained significant damages, including the loss of two purchase offers that would have paid creditors in full and provided a return to shareholders.

### Count Six: Breach of Fiduciary Duties as to Gregory

122.   Trustee fully incorporates and realleges the foregoing allegations as if fully stated herein.

123.   Gregory, Vice President of Research and Development, owed Debtor and its shareholders a fiduciary duty of due care, loyalty, and good faith.

124.   In addition to breaching these duties in the manner set forth in Count One, as evidenced by the HHA, Gregory breached his specific duties in his role as the Vice President of Research and Development by failing to alert the board about the URC prior to the prospective purchaser's discovery of the issue.

125.   Moreover, Gregory, as an officer on the manufacturing, operations and research and development team, on information and belief, knew of the URC prior to it being discovered by the prospective purchaser, as evidenced by the December 11, 2019 HHA. Despite this knowledge, Gregory failed to undertake any course of action to correct this deviation, prior to the prospective purchaser discovering the URC on or about December 5, 2019.

126.   As a direct and proximate result of Gregory's failure to perform his fiduciary obligations, the Debtor has sustained significant damages, including the loss of two purchase offers that would have paid creditors in full and provided a return to shareholders.

**Count Seven: Breach of Fiduciary Duties as to Nguyen**

127.    Trustee fully incorporates and realleges the foregoing allegations as if fully stated herein.

128.    Nguyen, as Chief Commercial Officer, owed Debtor and its shareholders a fiduciary duty of due care, loyalty, and good faith.

129.    In addition to breaching these duties in the manner set forth in Count One, Nguyen breached his specific duties in his role as the Chief Commercial Officer by failing to alert the Board about the URC prior to the prospective purchaser's discovery of the issue.

130.    Moreover, Nguyen, as an officer responsible for overall sales of the V-Go®, on information and belief, knew of the URC prior to it being discovered by the prospective purchaser, as evidenced by the December 11, 2019 HHA. Despite this knowledge, Nguyen failed to undertake any course of action to correct this deviation, prior to the prospective purchaser's discovery of the URC on or about December 5, 2019.

131.    Moreover, Nguyen focused on satisfying Zealand's purchase conditions that would increase his chance of receiving KEIP payments and ensure his post-sale employment with Zealand rather than ensuring that the true root cause of the V-Go®'s performance deviations was disclosed to the public.

132.    As a direct and proximate result of Nguyen's failure to perform his fiduciary obligations, the Debtor has sustained significant damages, including the loss of two purchase offers that would have paid creditors in full and provided a return to shareholders.

**Count Eight: Breach of Fiduciary Duties as to Saldhana**

133.    Trustee fully incorporates and realleges the foregoing allegations as if fully stated herein.

134.   Saldhana, as Chief Business Officer, owed Debtor and its shareholders a fiduciary duty of due care, loyalty, and good faith.

135.   In addition to breaching these duties in the manner set forth in Count One, Saldhana breached his specific duties in his role as the Chief Business Officer by failing to alert the board about the URC prior to the prospective purchaser's discovery of the issue.

136.   Moreover, Saldhana, as an officer responsible for overall sales of the V-Go®, on information and belief, knew of the URC prior to it being discovered by the prospective purchaser. Despite this knowledge, Saldhana failed to undertake any course of action to correct this deviation, prior to the prospective purchaser discovering the URC on or about December 5, 2019.

137.   As a direct and proximate result of Saldhana's failure to perform his fiduciary obligations, the Debtor sustained significant damages, including the loss of two purchase offers that would have paid creditors in full and provided a return to shareholders.

**Count Nine: Breach of Fiduciary Duties as to Conley**

138.   Trustee fully incorporates and realleges the foregoing allegations as if fully stated herein.

139.   Conley, Vice President, Corporate Controller, Treasure, owed Debtor and its shareholders a fiduciary duty of due care, loyalty, and good faith.

140.   In addition to breaching these duties in the manner set forth in Count One, Conley breached his specific duties in his role as the Vice President, Corporate Controller, Treasure by failing to alert the board about the URC prior to the prospective purchaser's discovery of the issue.

141.   Moreover, Conley, as an officer apparently partially responsible for corporate compliance, on information and belief, knew of the URC prior to it being discovered by the prospective purchaser. Despite this knowledge, Conley failed to undertake any course of action to

correct this deviation, prior to the prospective purchaser discovering the URC on or about December 5, 2019.

142.    As a direct and proximate result of Conley's failure to perform his fiduciary obligations, the Debtor has sustained significant damages, including the loss of two purchase offers that would have paid creditors in full and provided a return to shareholders.

### Count Ten: Breach of Fiduciary Duties as to Zajac

143.    Trustee fully incorporates and realleges the foregoing allegations as if fully stated herein.

144.    Zajac, Vice President of Operations, owed Debtor and its shareholders a fiduciary duty of due care, loyalty, and good faith.

145.    In addition to breaching these duties in the manner set forth in Count One, as evidenced by the CAPA, Zajac breached his specific duties in his role as the Vice President of Operations by failing to alert the Board about the URC prior to the prospective purchaser's discovery of the issue.

146.    Zajac, as an officer on the manufacturing, operations, and research and development team, on information and belief, knew of the URC prior to it being discovered by the prospective purchaser, as evidenced by the December 11, 2019 CAPA and HHA. Despite this knowledge, Zajac failed to undertake any course of action to correct this deviation, prior to the prospective purchaser discovering the URC on or about December 5, 2019.

147.    Additionally, Zajac focused on satisfying Zealand's purchase conditions that would increase his chance of receiving KEIP payments and ensure his post-sale employment with Zealand rather than ensuring that the true root cause of the V-Go®'s performance deviations was disclosed to the public.

148.    As a direct and proximate result of Zajac's failure to perform his fiduciary obligations, the Debtor has sustained significant damages, including the loss of two purchase offers that would have paid creditors in full and provided a return to shareholders.

**Count Eleven: Aiding and Abetting Breaches**
**of Fiduciary Duty (against the Board) (in the alternative)**

149.    Trustee fully incorporates and realleges the foregoing allegations as if fully stated herein.

150.    The Board's failure to have an oversight system in place, and leaving the Officers to report critical issues to the Board at their own discretion and on an ad-hoc basis, encouraged and assisted the Officers in breaching their fiduciary duties by, among other things, facilitating, allowing, and causing these violations to occur, including but not limited to:

- implementing the URC without FDA approval or studies supporting its safety or efficacy;

- failing to alert the Board about the URC prior to the prospective purchaser's discovery of the issue;

- allowing the continued use of the URC after July 2018 to December 2019, in violation of the 510(k); and

- drafting and issuing a press release that inaccurately stated the root cause of the product issue.

151.    The Board's encouragement of and assistance to the Officers in the foregoing matters was a substantial factor in bringing about the damages suffered by the Debtor because of the Officers' breaches of their fiduciary duties to the Debtor and its shareholders.

152.    As a result of its encouragement of and assistance to the Officers in the above-described manner, the Board is jointly and severally liable with the Officers for the damages caused by the Officers' breaches of their fiduciary duties, the exact amount of which will be determined at trial.

## Count Twelve: Aiding and Abetting Breaches
## of Fiduciary Duty (against the Officers) (in the alternative)

153.    Trustee fully incorporates and realleges the foregoing allegations as if fully stated

herein.

154.    The Officers' 1) implementation of the URC without FDA approval or studies

supporting its safety or efficacy, and failure to alert the board of the URC prior to the prospective

purchaser's discovery of the URC; and 2) participation in the inaccurate and misleading

disclosures as to the root cause of the product, assisted the Board in breaching its fiduciary duties

by, among other things, facilitating, allowing, and causing these violations to occur, including but

not limited to:

- not having in place a meaningful system of monitoring the V-Go®'s compliance, acceptance criteria, manufacture, quality control and patient safety;

- ignoring "red flags" as to the V-Go®'s compliance issues;

- failing to ensure a reasonable information and reporting system existed after the compliance red flags raised by the FDA site audit in September 2018; and

- drafting and issuing a press release that inaccurately stated the root cause of the product issue.

155.    The Officers' encouragement of and assistance to the Board in the foregoing

matters was a substantial factor in bringing about the damages suffered by the Debtor because of

the Board's breaches of its fiduciary duties to Debtor and its shareholders.

156.    As a result of their encouragement of and assistance to the Board in the above-

described manner, the Officers are jointly and severally liable with the Board for the damages

caused by the Board's breaches of fiduciary duties, the exact amount of which will be determined

at trial.

## CONCLUSION AND PRAYER

157.    For the reasons stated above, Trustee respectfully requests that Defendants be cited and ordered to appear and answer herein.

158.    Trustee respectfully requests that this Court enter judgment in its favor and award to it:

a.    Damages in favor of Trustee against Defendants, jointly and severally; and

b.    All other legal and equitable relief to which Trustee may be justly entitled.

Dated:  February 8, 2022
Wilmington, Delaware                              **MORRIS JAMES LLP**

*/s/ Sarah M. Ennis*
Eric J. Monzo (DE Bar No. 5214)
Sarah M. Ennis (DE Bar No. 5745)
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801
Telephone: (302) 888-6800
Facsimile: (302) 571-1750
E-mail: emonzo@morrisjames.com
E-mail: sennis@morrisjames.com

Alan Dabdoub (*pro have vice* pending)
Kyle A. Gardner (*pro have vice* pending)
**LYNN PINKER HURST &
SCHWEGMANN, LLP**
2100 Ross Avenue, Suite 2700
Dallas, TX 75201
Telephone: (214) 981-3800
Facsimile: (214) 981-3839
E-mail: adabdoub@lynnllp.com
E-mail: kgardner@lynnllp.com

*Attorneys For Trustee Emerald Capital
Advisors, Corp.*